# STATE OF MONTANA,
## Plaintiff and Appellee,
### v.
# KARLYLE STEVEN LEE PLOUFFE,
## Defendant and Appellant.

No. DA 12-0638.
Submitted on Briefs May 14, 2014.
Decided July 15, 2014.
2014 MT 183.
375 Mont. 429.
329 P.3d 1255.

For Appellant: **Wade Zolynski**, Chief Appellate Defender, **Eileen A. Larkin** (argued), Assistant Appellate Defender, Helena.

For Appellee: **Timothy C. Fox**, Montana Attorney General,

**Mardell Ployhar** (argued), Assistant Attorney General, Helena; **Marcia Boris**, Mineral County Attorney, Superior.

JUSTICE McKINNON delivered the Opinion of the Court.

¶1 Karlyle Plouffe appeals from the order of the Fourth Judicial District Court, Mineral County, denying his motions to suppress and dismiss charges of criminal possession of dangerous drugs and distribution of dangerous drugs, both felonies. We reverse. We restate the issue on appeal as follows:[1]

¶2 Was Plouffe's constitutional right against compelled self-incrimination, guaranteed by Article II, Section 25 of the Montana Constitution and the Fifth Amendment of the United States Constitution, violated by the State's use of confidential Treatment Court material?

## BACKGROUND

¶3 Plouffe was charged in 2011 with trespass to property and possession of dangerous drugs (marijuana), both misdemeanor offenses. At his initial appearance in Justice Court, Plouffe was advised of his rights, including his right to counsel. Justice of the Peace Wanda James advised Plouffe that he may be eligible to participate in the Mineral County Treatment Court (Treatment Court), and Plouffe expressed interest in doing so. Judge James then contacted the public defender's office to notify it that Plouffe needed to be appointed counsel. Public defender Kirk Krutilla was appointed, although Plouffe maintains that he never met with any defense counsel regarding either of the two charges.

¶4 The Treatment Court has a Treatment Team consisting of professionals who assist Judge James with processing cases. The Treatment Team includes Judge James, County Attorney Marcia Boris, Mineral County Sheriff Ernie Ornelas, and two probation and parole officers, Tim Case and Jay Childress. Initially, the Treatment Team included defense attorney Krutilla, but the Team at the time had no defense attorney due to a lack of funding. Nevertheless, although Krutilla no longer officially participated in Treatment Court, it appears he at least reviewed the Treatment Agreement with Plouffe, as Plouffe's Treatment Agreement was signed by Kirk Krutilla, "Attorney for Defendant."

¶5 Before Plouffe could participate in Treatment Court, he was

---

[1] As we have determined that our restated issue is dispositive, we will not address Plouffe's other alleged constitutional violations primarily related to his right to counsel.

required to enter into a written Treatment Agreement. The Treatment Agreement is governed by the provisions of the Drug Offender Accountability and Treatment Act, Title 46, chapter 1, part 11, MCA. Plouffe signed a Treatment Agreement to enroll in Treatment Court, along with two of his friends, Christopher Hewitt and Roger Raedel. Pursuant to the Treatment Agreement, Plouffe entered conditional guilty pleas to the two misdemeanors. Sentencing was continued until he either successfully completed Treatment Court, or was otherwise discharged from the program. The Treatment Agreement provided that if Plouffe successfully completed Treatment Court, he would be able to withdraw his guilty pleas and have the charges dismissed. However, if Plouffe did not successfully complete Treatment Court and was discharged from the program, the Treatment Agreement provided he would "be sentenced by the Mineral County Justice of the Peace in a manner consistent with the sentences typically imposed on other defendants for comparable offenses."

¶6 The Treatment Agreement emphasized the extended period needed for treatment, depending on the "treatment issues" and "pace of progress" of the participant, and that it was likely a participant would be enrolled in Treatment Court a minimum of 18 months. The Treatment Agreement also required that Plouffe waive several rights in order to obtain treatment. Plouffe was required to waive his right to speedy trial, his right to assert any claim based on the delay in sentencing, and his privilege of confidentiality that attaches to records maintained by health care providers. The Treatment Agreement required Plouffe to release confidential information from his treatment providers to the Treatment Team, and allow for the sharing of confidential information between Treatment Team members and the court so that Plouffe's progress, or lack thereof, could be assessed and monitored.

¶7 The Treatment Agreement also required Plouffe to comply with a number of conditions, including to "check in with the Mineral County Misdemeanor Probation Officer as directed and follow all reasonable directives of the probation officer." He was required to submit to random drug testing that was requested by a Treatment Team member. The Treatment Agreement explained that a positive drug test result was sufficient to conclude that Plouffe had violated program rules and would result in an appropriate sanction, to which Plouffe would "promptly submit." Reasonable incentives may include but are not limited to: graduation certificates, early graduation, fee reduction or waiver of fees, record expungement of the underlying case, or

reduced contact with a probation officer. Section 46-1-1104(3), MCA. Sanctions may include: a short-term jail sentence, fines, extensions of time in the program, peer review, geographical restrictions, termination, or contempt of court. Section 46-1-1104(4), MCA. Plouffe also agreed to "honestly answer all questions asked by team members, counselors, therapists or law enforcement personnel including the probation officer."

¶8 Plouffe, as is typical of participants in a treatment court, had varied success in complying with Treatment Court requirements. Relevant to the instant proceedings, in October 2011, Plouffe was ordered not to associate with Hewitt and Raedel while a participant in Treatment Court, as the three were suspected of using drugs together. Further, Plouffe was rewarded early in his Treatment Court progress with a "week off" for his "great honesty," and for successfully completing a report about honesty. In spite of this, Plouffe was sanctioned on August 3, 2011, and September 14, 2011, for being dishonest and received a four-day jail sentence and house arrest, respectively. Plouffe was therefore aware of the significance Treatment Court placed on being honest and that he could be sanctioned with incarceration if his actions were interpreted by the Treatment Team as dishonest. He also understood that he was not to associate with Hewitt and Raedel.

**First, non-Mirandized, interview**

¶9 On October 5, 2011, Treatment Team member Case administered a routine urinalysis (UA) to Plouffe, Hewitt, and Raedel pursuant to standard Treatment Court procedures. All three tested positive for benzodiazepine. A few days prior, Hewitt's grandmother, Ms. Mary Mellen, reported to the Mineral County Sheriff's Office that someone had stolen prescription pills from a locked box in her home. The investigating sheriff's deputy learned that numerous people had access to the locked box, and law enforcement was thus unable to determine who had taken the pills. Case explained to the District Court that generally, when a Treatment Court participant has a positive UA, he asks the participant the type and quantity of the drug the participant ingested, and where it was obtained. Case decided it was necessary to separate Plouffe, Hewitt, and Raedel to ask them these questions individually. Case thus requested Sheriff Ornelas, also a Treatment Team member, to assist with questioning. Case next requested assistance from felony probation officer Valerie Chestnut, who was

apparently filling in for Treatment Team member Childress.[2] Case told Ornelas and Chestnut that he was suspicious of Plouffe's UA results in light of the recent report of theft by Hewitt's grandmother.

¶10 Plouffe was attending an AA meeting when Case removed him for questioning about his positive UA. Case did not advise Plouffe of his *Miranda* rights. In separate rooms, Ornelas and Chestnut questioned Raedel and Hewitt, respectively, also without advising them of their *Miranda* rights. Plouffe, Hewitt, and Raedel were asked why they had tested positive. Raedel stated that Hewitt had stolen pills from Hewitt's grandmother, Ms. Mellen. Plouffe and Hewitt, however, reported a different incident involving Valium.

**Second, Mirandized, interview**

¶11 After considering the report on the unresolved theft of Ms. Mellen's prescription drugs, Ornelas decided to conduct a second, more in-depth interview. Plouffe, Hewitt, and Raedel were taken to the Sheriff's Office and Case read them their *Miranda* rights. Case and Chestnut questioned Plouffe, separate from Hewitt and Raedel, in an attempt to "get the story of why it was that they were positive." Case explained to the District Court that he advised Plouffe of his *Miranda* rights just to be cautious, and that he did not contemplate that there would be new criminal charges. Case, as a misdemeanor probation officer employed by Mineral County to work on the Treatment Team, had no authority to conduct felony criminal investigations. Case described his role in the interview process as follows: "I was not gathering evidence for a new crime. I was getting to the truth on a bad UA, which led to information on a new crime." During this second interview, Plouffe admitted that he had used Valium, but denied possessing any of the stolen pills.

---

[2] While the State and Plouffe agree that Chestnut was filling in for Childress, the parties dispute whether Chestnut was a member of the Treatment Team and thus could share in the exchange of confidential material. As Chestnut's status on the Treatment Team is not critical to resolving the instant dispute because confidential information was exchanged with Deputy Bettis, who clearly was not a member of the Treatment Team, we will refrain from commenting further regarding Chestnut's status. We do observe, however, that in order to protect the integrity of the treatment court process, guidelines must be in place which guard against the unauthorized disclosure of confidential material. To the extent such guidelines are absent or perhaps unobserved by the Mineral County Treatment Court, we suggest that the Treatment Team reacquaint themselves with these principles. *See* Natl. Assn. of Drug Court Professionals, Drug Court Standards Committee, *Defining Drug Courts: The Key Components* (U.S. Dept. of Just., Bureau of Just. Assistance, Oct. 2004).

¶12 Plouffe was never informed during this second interview that the questioning was related to a new charge and unrelated to Treatment Court. Rather, the second interview was conducted under the auspices of Treatment Court, as evidenced by Case's statement that "they handled this case the way they had handled every other drug court investigation." While conducting the interview, Case emphasized the importance of telling the truth on multiple occasions, as follows:

Case: And who did they tell you did it? Stole [the prescription pills]?

Plouffe: (inaudible) younger (inaudible)

Case: Who?

Plouffe: I ain't gonna say anything.

Case: This, we're beyond the "I'm not gonna rat out somebody." We already, we're already here at this place and this isn't about you saying that he did it or this, this isn't, we're not, we're now at the point of just comparing stories. So I mean, I've never led you wrong, I've only tried to help you, ya know, so whatever you want to say but be honest is gonna be the most helpful thing for you.

. . .

Case: ... the confusing part is [Hewitt and Raedel] are surprisingly more honest and open about all of it than you're being and I really expected you'd be more open 'cause it, you ... .

Plouffe: I'm being open, I'm telling you the truth. ...

. . .

Case: Okay so why don't you tell us, 'cause obviously you know who lives [at the house where the Valium was purchased]. And I know who lives there.

Plouffe: I even know who lives there now.

Case: So this is where I'm talking about you not being completely honest.

. . .

Case: Right now, are [Hewitt and Raedel] hiding? If we wanted, if we need to go find 'em, are they in the 5th wheel, do you have any idea where [Hewitt] would be stupid enough to hide them?

Plouffe: Chris probably, I don't know.

Case: Okay.

Plouffe: I'm being honest.

Case: I know, okay.

Plouffe: Okay.

Case: ... Uh, so thank you for being honest okay?

At the conclusion of the interview, Case told Plouffe that the

information Plouffe provided would be discussed with Judge James and result in a sanction. Case later explained that at the time he made that statement, he thought that a Treatment Court sanction would be the only result from the interview.

**Third, Mirandized, interview**

¶13 As a result of their two interviews, Case and Chestnut decided to turn over all the information gathered to the Sheriff's Office, and that "[the Sheriff's Office] would decide if they were going to investigate it further—if it was a new crime." After reviewing this new information, Sheriff Ornelas assigned Deputy Joseph Bettis to investigate further. Case testified in the District Court that he then advised Bettis, who was not a Treatment Team member, "about the three individuals, since I knew them, and had been working with all three of them" and "[I could] give him the information that we had." Thereafter, Bettis conducted a third interview, in which Case participated. Case described his participation as, "I just helped where I saw a need to," so that "[I could] help clarify details, direction, who they are, who they were involved with, family members, stuff like that." Bettis started his interview of Plouffe by reading him his *Miranda* rights and asking Plouffe if he knew why he was being questioned. Plouffe responded that he was there because he was being blamed for stealing pills, and because of a positive UA. At no time during this third interview was Plouffe informed that he was being investigated for new criminal charges or that the questioning was unrelated to Treatment Court. Although Case explained to the District Court that he did not intend to ask any questions during this third interview, he nevertheless asked a "few" questions on "things that I thought Deputy Bettis was either confused on, or where I could see where there was miscommunication between the two of them, just due to my knowing the offenders as much as I did." At the end of the interview Bettis informed Plouffe that he was going to turn the information over to County Attorney Marcia Boris. As previously noted, Boris was also a member of the Treatment Team. A review of this third interview confirms that there were more than nine instances in which Bettis cautioned Plouffe about being dishonest, not telling "the whole story," lying, or not being truthful. Upon conclusion of this third interview, Plouffe had again admitted that he used Valium and, in contrast to his earlier statement, that he had used and sold some of the pills Hewitt stole from his grandmother. Plouffe revealed that he, Hewitt, and Raedel "all sold a few" and that he had sold five to ten pills.

¶14 During the same timeframe these interviews were being

conducted, the Treatment Team held its weekly staffing meeting and considered Plouffe's treatment progress. As a result of Plouffe's positive UA, Plouffe received an "F" for the week and was sanctioned to seven days in jail. The record does not establish whether the Treatment Team, in imposing its sanction, considered Plouffe's "honesty" during the interviews when he divulged the nature and source of his drug usage and other incriminating information.

¶15 Following the third interview, Case sent a report to Sheriff Ornelas, County Attorney Boris, Chestnut, and Bettis detailing the information he learned from all three interviews with Plouffe. Boris then filed an Affidavit of Probable Cause and Complaint in Justice Court, accusing Plouffe of distribution of dangerous drugs in violation of § 45-9-101, MCA, and two counts of possession of dangerous drugs in violation of § 45-9-102, MCA. An Information was subsequently filed in District Court charging Plouffe with the same offenses.

¶16 Plouffe filed motions to suppress and dismiss, arguing in part that the State had: violated his Sixth Amendment right to counsel; violated his Fifth Amendment privilege against self-incrimination; and violated the confidentiality provision of § 46-1-1111(4), MCA, by disclosing the results of his UA to persons not on the Treatment Team. Judge James testified at the suppression hearing that she did not believe Treatment Team members could share confidential information with individuals who were not on the Treatment Team and, further, that allowing for such would undercut the purpose of Treatment Court. Plouffe testified that he believed the interviews would only result in his being sanctioned by the Treatment Court, and that he feared he would be sanctioned if he was not honest with Case, or if he refused to answer Case's questions. Plouffe stated that he understood he was providing incriminating information.

¶17 The District Court denied Plouffe's motions. Plouffe entered into an agreement to plead guilty to possession of dangerous drugs, expressly reserving his right to appeal the rulings on the motions to suppress and dismiss. Plouffe received a three-year deferred sentence and was required to enter and complete the boot camp program.

## STANDARDS OF REVIEW

¶18 The interpretation of a statute is a matter of law, and we review whether the district court correctly interpreted and applied a statute de novo. *State v. Shively*, 2009 MT 252, ¶ 13, 351 Mont. 513, 216 P.3d 732 (citing *State v. McWilliams*, 2008 MT 59, ¶ 22, 341 Mont. 517, 178 P.3d 121; *State v. Triplett*, 2008 MT 360, ¶ 13, 346 Mont. 383, 195 P.3d

819). We review a motion to suppress to determine whether a district court's findings of fact are clearly erroneous, and whether those findings were correctly applied as a matter of law. *State v. Dawson*, 1999 MT 171, ¶ 13, 295 Mont. 212, 983 P.2d 916 (citing *State v. Parker*, 1998 MT 6, ¶ 17, 287 Mont. 151, 953 P.2d 692; *State v. Roberts*, 284 Mont. 54, 56, 943 P.2d 1249, 1250 (1997)). "The grant or denial of a motion to dismiss in a criminal proceeding is a question of law which we review de novo to determine whether the district court's conclusion of law is correct." *State v. Walker*, 2008 MT 244, ¶ 9, 344 Mont. 477, 188 P.3d 1069 (citing *State v. Weaver*, 2008 MT 86, ¶ 9, 342 Mont. 196, 179 P.3d 534; *State v. Luckett*, 2007 MT 47, ¶ 6, 336 Mont. 140, 152 P.3d 1279).

## DISCUSSION

¶19 We have not previously had occasion to resolve a dispute arising from a treatment court proceeding, despite treatment courts having been in existence in Montana since 2005. The premier authority on the goals and practice guidelines of treatment courts can be found in the Key Components established by the National Association of Drug Court Professionals (NADCP) and the United States Department of Justice. *See* Natl. Assn. of Drug Court Professionals, Drug Court Standards Committee, *Defining Drug Courts: The Key Components* (U.S. Dept. of Just., Bureau of Just. Assistance, Oct. 2004). Drawing from the Key Components, the terms of the particular Treatment Agreement currently at issue, and the provisions of the Drug Offender Accountability and Treatment Act, we make several observations about the functioning of treatment courts.

¶20 To begin, treatment courts operate in a manner that is fundamentally different than that of the traditional adversarial system. The shared goals of treatment court—providing a participant with the tools to combat addiction and to reduce recidivism—are accomplished through a collaborative approach that addresses a participant's dependency issues. While each treatment court is different, they all share certain basic elements. In general, honesty is a linchpin to progressing through the phases of treatment court. Participants are rewarded for telling the truth, and sanctioned for lying. When participants attend treatment court's weekly open sessions, they are rewarded with reduced sanctions when they are truthful about relapses or other violations of the treatment agreement. Treatment court team members meet weekly to discuss the progress of participants. By virtue of statutory provisions and the limited

releases granted by participants for the disclosure of confidential information, the treatment team's discussions remain confidential and information utilized by the treatment team is for treatment court purposes only. If a participant fails to comply with any of the rules listed in the treatment court agreement, the treatment team will decide whether to impose a sanction, which may include incarceration and a change in the participant's treatment plan. Correspondingly, positive behavior is encouraged via incentives, which may include anything from praise to advancement through a phase.

¶21 The facts of the instant case specifically involve many of these Key Components. Key Component #2 states: "Using a nonadversarial approach, prosecution and defense counsel promote public safety while protecting participants' due process rights." In order to accomplish this goal, the prosecuting attorney must agree "that a positive drug test or open court admission of drug possession or use will not result in the filing of additional drug charges based on that admission." Key Component #5, which addresses drug and alcohol testing, states: "Frequent court-ordered AOD [alcohol and other drug] testing is essential. An accurate testing program is the most objective and efficient way to establish a framework for accountability and to gauge each participant's progress." Key Component #5 further provides that "[t]imely and accurate test results promote frankness and honesty among all parties" and that "AOD testing is central to the drug court's monitoring of participant compliance." Finally, regarding the maintenance of confidential information and its importance to treatment courts, Key Components #4, #8, and #9 require, respectively, that "[i]nformation exchange complies ... with applicable State statutes"; that "[a]utomated manual information systems must adhere to written guidelines that protect against unauthorized disclosure of sensitive personal information about individuals"; and that the Treatment Team be educated regarding "Federal, State and local confidentiality requirements." These Key Components illustrate that participant honesty, including honesty about drug use, is required to comply with treatment court objectives and rules. In order to facilitate these objectives, the NADCP encourages that certain practice guidelines be established, consistent with state statutes, which maintain the confidentiality of treatment court information

¶22 *Was Plouffe's constitutional right against compelled self-incrimination, guaranteed by Article II, Section 25 of the Montana Constitution and the Fifth Amendment of the United States Constitution, violated by the State's use of confidential*

*Treatment Court material?*[3]

¶23 The Fifth Amendment and Article II, Section 25, provide that no person shall be compelled to testify against himself or herself in a criminal proceeding. Generally, this right to be free from compelled self-incrimination must be affirmatively invoked by the person claiming the right at the time of questioning; if a person fails to invoke the right then the right will be deemed waived. *U.S. v. Monia*, 317 U.S. 424, 427, 63 S. Ct. 409, 410-11 (1943); *State v. Hameline*, 2008 MT 241, ¶ 22, 344 Mont. 461, 188 P.3d 1052; *State v. Fuller*, 276 Mont. 155, 160, 915 P.2d 809, 812 (1996). An exception to this general rule exists, however, where a person is not free to admit, deny, or refuse to answer when questioned. *Fuller*, 276 Mont. at 161, 915 P.2d at 812 (citing *Minn. v. Murphy*, 465 U.S. 420, 429, 104 S. Ct. 1136, 1143 (1984)). Such a situation arises when "the government prevents a voluntary invocation of the Fifth Amendment by threatening to penalize the individual should he or she invoke it." *Fuller*, 276 Mont. at 162, 915 P.2d at 813; *see also State v. Woods*, 2005 MT 186, ¶ 18, 328 Mont. 54, 117 P.3d 152. "If a defendant is in a situation where he is not 'free to admit, deny, or refuse to answer,' then his privilege against self-incrimination is automatic and self-executing." *Woods*, ¶ 18 (quoting *Fuller*, 276 Mont. at 161, 915 P.2d at 812). We have identified this dilemma as a "classic penalty situation." *Hameline*, ¶ 22.

¶24 ▮ Where an individual reveals incriminating information pursuant to an agreement or a guarantee of confidentiality, that information cannot be used as a basis for a subsequent criminal prosecution. *Fuller*, 276 Mont. at 167, 915 P.2d at 816. As we have stated,

> We emphasize that this holding does not stand for the proposition that the State may not compel a defendant to answer. It can; indeed, in order for treatment to be effective, it must, because a defendant who refuses to disclose his offense history cannot be successfully treated. However, *if the State chooses to compel answers to incriminating questions, it cannot use those answers against the defendant in a later criminal proceeding.*

*Fuller*, 276 Mont. at 167, 915 P. 2d at 816 (emphasis added).

¶25 In 2005, Montana enacted the Drug Offender Accountability and

---

[3] The constitutional issues on appeal have been confounded. Nevertheless, Plouffe has consistently claimed that his right against compelled self-incrimination has been violated. Our task here is to address the issues raised in the appeal. We therefore have restated the issue regarding Plouffe's constitutional claim.

Treatment Act. Its purpose was to "recognize that state courts have a jurisdictional basis to implement drug treatment courts to reduce recidivism and restore drug offenders to being productive, law-abiding, and taxpaying citizens." Section 46-1-1102, MCA. The structure and general operation of drug treatment courts are set forth in § 46-1-1104, MCA, which provides for a method of graduated sanctions and incentives designed to motivate and support the participant in his or her path toward living a substance-free life which is productive and law-abiding. In order to facilitate these goals and purposes, § 46-1-1111, MCA, provides for the manner of drug testing, an integral part of the functioning of a drug treatment court, as follows:

(1) The drug treatment court team shall ensure fair, accurate testing and reliable drug testing procedures.

(2) A drug offender must be ordered to submit to frequent, random, and observed drug testing to monitor abstinence.

(3) The results of all drug tests must be provided to the drug treatment court team as soon as practicable but, in the event of a positive test, not later than 7 days from the test.

(4) *Anyone in receipt of drug tests shall maintain the information in confidentiality.*

(5) A drug offender is responsible for costs, pursuant to 46-1-1112(2).

(Emphasis added.)

¶26 Section 46-1-1111(4), MCA, is clear on its face and prohibits members of a drug court treatment team from sharing drug testing results with non-treatment team members. Case and all other Treatment Team members were therefore prohibited from disclosing the results of Plouffe's UA to anyone outside the Treatment Team. Plouffe's belief that the results of his UA would be kept confidential among the Treatment Team was justified and warranted by law. Consequently, the State breached the Treatment Agreement and violated § 46-1-1111(4), MCA, when it disclosed the results of Plouffe's UA to persons who were not members of the Treatment Team and, further, when it used Plouffe's UA as a basis for questioning and investigating a new offense.

¶27 The State argues that Plouffe's drug testing results are "confidential criminal justice information" pursuant to § 44-5-103(3), MCA, and therefore can be shared with criminal justice agencies. It is a well-established rule of statutory construction that specific provisions prevail over general provisions. *Oster v. Valley Co.*, 2006 MT 180, ¶ 17, 333 Mont. 76, 140 P.3d 1079 ("[M]ore specific statutes

prevail over general provisions of law."); *Taylor v. Dept. of Fish, Wildlife & Parks*, 205 Mont. 85, 91, 666 P.2d 1228, 1231 (1983) ("We recognize the rule of statutory construction which provides that special statutes will prevail over general statutes."); § 1-2-102, MCA ("[A] particular intent will control a general one that is inconsistent with it."). The State here argues that Plouffe's drug test results are not controlled by a statute addressing the confidentiality of drug test results within the Drug Offender Accountability and Treatment Act, Title 46, chapter 1, part 11, MCA, but rather by a statute within the Montana Criminal Justice Information Act of 1979, Title 44, chapter 5, parts 1-6, MCA. We are not, however, persuaded. It is clear that § 46-1-1111(4), MCA, which specifically addresses drug test results in the context of treatment court, controls over the more general confidentiality provisions contained within § 44-5-103, MCA.

¶28 We are also convinced that, apart from the State's actions in breaching the Treatment Agreement and in violating the provision of § 46-1-1111(4), MCA, the particular circumstances surrounding Plouffe's interviews placed Plouffe in a "classic penalty situation" for which he was compelled to provide incriminating information. There is little question that what initially began as an appropriate inquiry for Treatment Court purposes grew into a criminal investigation of new charges. The common and predominant thread through all three interviews, whether by design or accident, was the presence of and reference to Case and other Treatment Team members. Case testified that he participated in the third interview—the interview from which the substance of the new charges was ultimately derived—in order to "help clarify details, direction, who they are, who they were involved with, family members, stuff like that." The third interview was conducted by Deputy Bettis, who was not a member of the Treatment Team. The information that Case provided was obtained through his role as a probation officer on the Treatment Team. Significantly, the interviews originated primarily from Plouffe's positive UA and thereafter grew from Plouffe's correct belief and corresponding action that he must be honest in order to comply with the requirements of Treatment Court. Plouffe similarly understood that he was providing incriminating information. Bettis's statement that the results of the interviews would be passed to the prosecutor did little to inform Plouffe that he was not being questioned pursuant to Treatment Court protocol, as the prosecutor was also a member of the Treatment Team and Bettis's representation was consistent with imposition of a Treatment Court sanction. We therefore conclude that Plouffe was

placed in the "classic penalty situation" of having to provide incriminating information or face the alternative of a sanction or discharge from Treatment Court.

¶29 In reaching this conclusion, we observe that Plouffe had been working with Case in a therapeutic setting for the past seven months. Case found Plouffe in an AA meeting, which he was attending as a requirement of Treatment Court. Case then questioned Plouffe about the results of a drug test that was administered pursuant to Treatment Court, in the same building where Treatment Court was held. Throughout the second interview, Case repeatedly emphasized that Plouffe was required to tell the truth, and Plouffe repeatedly made incriminating statements after being prompted to be honest. These circumstances support Plouffe's contention that the informal, collaborative functioning of the Treatment Court was used by law enforcement and the County Attorney, whether knowingly or not, to obtain information for investigation of a new criminal offense. Under these circumstances, and absent clear evidence establishing the interviews were conducted outside the context of Treatment Court, Plouffe was "not free to admit, deny, or refuse to answer when questioned." *Fuller*, 276 Mont. at 161, 915 P.2d at 812.

## CONCLUSION

¶30 We conclude that the State violated § 46-1-1111(4), MCA, by disclosing confidential drug testing information to law enforcement in order to investigate a new criminal offense. Absent evidence establishing that questioning by law enforcement occurred outside the context of Treatment Court proceedings, we conclude that Plouffe was impermissibly required to "choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent," *Fuller*, 276 Mont. at 166-67, 915 P.2d at 816 (citing *Murphy*, 465 U.S. at 436, 104 S. Ct. at 1147), because Plouffe believed that he had to answer questions honestly in order to comply with Treatment Court rules. As a result, the State may not use the information derived from the three interviews in a later criminal proceeding. The District Court erred in denying Plouffe's motions to dismiss and suppress.

¶31 We reverse Plouffe's conviction and vacate the District Court's judgment.

CHIEF JUSTICE McGRATH, JUSTICES BAKER, COTTER, WHEAT, and RICE and DISTRICT JUDGE NEILL, sitting for the vacant position.