FILED

December 16 2014

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 13-0788

DA 13-0788

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 328

RANDALL SIMMS,

        Plaintiff and Appellant,

   v.

MICHAEL SCHABACKER, M.D.,

        Defendant and Appellee.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                    In and For the County of Yellowstone, Cause No. DV 10-1313
                    Honorable Russell C. Fagg, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Gene R. Jarussi, Bishop & Heenan Law Firm, Billings, Montana

                Michael G. Eiselein, Eiselein & Grubbs, PLLP, Billings, Montana

        For Appellee:

                Lee Bruner; Mark A. Thieszen, Poore, Roth & Robinson, P.C.,
                Butte, Montana

                              Submitted on Briefs:  September 24, 2014
                                        Decided:  December 16, 2014

Filed:

                                           _____
                                                        Clerk

Justice Patricia Cotter delivered the Opinion of the Court.

¶1     Randall Simms appeals the Thirteenth Judicial District Court's grant of summary judgment to Dr. Michael Schabacker. Schabacker was Simms' workers' compensation doctor from 2004 through 2007 following Simms' 1999 work-related accident. Simms sued Schabacker and St. Vincent Healthcare, Schabacker's employer, alleging Schabacker had disclosed private, confidential healthcare information about him to a law enforcement officer without Simms' permission. The District Court concluded that Schabacker's letter was authorized by applicable Montana law and that Schabacker did not knowingly assist law enforcement. The court granted Schabacker's motion for summary judgment. Simms appeals. We affirm.

## ISSUE

¶2     A restatement of the issue on appeal is whether the District Court erred in concluding that Schabacker did not knowingly assist law enforcement and that Montana law authorized Schabacker's letter to Montana State Fund addressing Simms' medical condition.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     Randall Simms has been before this Court on two previous occasions relating to his 1999 workers' compensation injury—*Simms v. State Comp. Ins. Fund*, 2005 MT 175, 327 Mont. 511, 116 P.3d 773 (*Simms I*) and *Mont. State Fund v. Simms*, 2012 MT 22, 364 Mont. 14, 270 P.3d 64 (*Simms II*). Detailed background facts are included in both *Simms I* and *Simms II*. Here, we outline only those facts necessary to place this appeal in context.

2

¶4 In the previous cases it was established that Simms was injured while on the job in 1999. The State Fund accepted liability for his injury claim. Simms subsequently became totally disabled and has been receiving total disability benefits since 2006. Schabacker has treated Simms since October 2004, and his testimony before the Workers' Compensation Court led to the settlement which provided Simms with permanent total disability and domiciliary care benefits. On April 12, 2006, St. Vincent's Northern Rockies Pain Rehabilitation Center (NRPRC) presented Simms with a "Notice of Privacy Policy" which Simms signed. This Notice informed Simms that NRPRC "may share [Simms' healthcare] information with your insurance companies" and "may disclose any information we collect when permitted or required by law. This may include but is not limited to, disclosures related to a court subpoena or similar legal requests, fraud investigations and an audit or security examination."

¶5 The origin of this case—*Simms III*—is a letter from State Fund attorney Thomas Martello to Schabacker dated June 20, 2007. The letter was written on Montana State Fund letterhead, indicated that Martello was legal counsel for State Fund, and enclosed a "compilation video" showing Simms engaged in various daily activities. The first video was recorded in 2002; the following ten videos were recorded between September 27, 2006, and May 1, 2007. The 2006/2007 videos showed Simms walking, shopping, lifting, and loading groceries without using assistive devices such as his walker or wheelchair. He was recorded entering, exiting, and driving a pickup truck without assistance or apparent difficulty. However, the videos recording Simms and his wife entering Schabacker's office building for scheduled visits show Simms walking slowly

and with apparent difficulty while using a four-wheeled walker. Martello asked Schabacker to review the recordings and provide his medical observations and comments given the disparity between Simms' diagnosis and prognosis (permanent total disability) and his functionality as seen in the videos. Simms' attorney was copied on the letter to Schabacker.

¶6 Schabacker dictated a response to Martello's letter on June 28, 2007, but did not send the letter to Martello at that time. On July 2, 2007, Martello forwarded a letter to Schabacker that Martello had received from Simms' attorney. Again, Martello's letter was on Montana State Fund letterhead, but noted under Martello's signature that Martello was both legal counsel for the State Fund and special assistant attorney general (SAAG).

¶7 On August 17, 2007, Schabacker faxed his June 28 letter to Martello. In the letter Schabacker noted that "there is an overwhelming disparity between what is present in the video and what I have been left to believe is his functional status," and that Simms' "physical capabilities markedly exceed those he reported and demonstrated to me in clinic." The doctor stated that, based upon the videos, it appeared that Simms had "nearly unrestricted physical capabilities in terms of lifting, carrying, walking, sitting, tossing and driving" and was no longer incapable of gainful employment. Schabacker stated he was disturbed by the videos. He indicated that Martello could contact him if Martello had questions or concerns about the contents of the letter.

¶8 Martello distributed Schabacker's letter to other persons and entities that had formerly provided medical treatment or insurance coverage to Simms. Based upon the

letter, State Fund and these parties sued Simms for fraud. These cases were ultimately dismissed and State Fund continues to pay workers' compensation benefits to Simms.

¶9 On July 28, 2010, Simms filed a complaint against Schabacker and St. Vincent Healthcare alleging that Schabacker had unlawfully disseminated Simms' private medical information to a law enforcement officer. The District Court resolved various issues as the litigation proceeded until Schabacker remained as the sole defendant and the single remaining issue was whether Schabacker's letter to Montana State Fund regarding Simms' abilities as displayed in the videos violated Simms' right to healthcare privacy as provided by § 50-16-801, et seq., MCA. In September 2013, both parties filed motions for summary judgment. The District Court held oral argument on these motions on October 7, 2013, and on October 30 rendered its order and decision.

¶10 The court addressed the importance of the physician-patient privilege but concluded that the disclosure statutes applicable to workers' compensation cases authorized Schabacker to have ex parte communications with Montana State Fund pertaining to Simms' relevant healthcare, and thus provided an exception to the physician-patient privilege. The court noted that State Fund and Schabacker had a history of ex parte communications regarding Simms' case as authorized by statute, and that this letter was in keeping with past correspondences. The court also concluded that Schabacker did not knowingly assist a law enforcement agency when he discussed Simms' medical condition with State Fund. Consequently, the District Court granted Schabacker's motion for summary judgment and denied Simms' motion.

¶11 Simms filed a timely appeal.

## STANDARD OF REVIEW

¶12 We review a district court's ruling on a motion for summary judgment de novo, applying the same criteria of M. R. Civ. P. 56 as did the district court. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3); *Baumgart v. State*, 2014 MT 194, ¶ 13, 376 Mont. 1, 332 P.3d 225 (citations omitted).

¶13 In response to a motion for summary judgment, the non-moving party must provide material and substantial evidence setting forth specific facts to raise a genuine issue of material fact, and cannot merely rely upon speculative or conclusory statements. *Baumgart*, ¶ 14 (citations omitted).

## DISCUSSION

¶14 *Did the District Court err in concluding that Schabacker did not knowingly assist law enforcement and that Montana law authorized Schabacker's letter to Montana State Fund addressing Simms' medical condition?*

¶15 The District Court concluded that the workers' compensation statutory scheme provides exceptions to the physician-patient confidentiality privilege by allowing ex parte communications between a claimant's physician and the workers' compensation insurer. The court concluded that Schabacker's communications with State Fund relative to Simms' medical condition, including the subject letter to Martello, were authorized under Sections 50-16-805(1), 50-16-527, and 39-71-604(2), MCA. The relevant portions of these statutes are set forth below:

> *50-16-805 Disclosure of information allowed for certain purposes.*

6

(1) To the extent provided in 39-71-604 and 50-16-527, a signed claim for workers' compensation or occupational disease benefits authorizes disclosure to the workers' compensation insurer, as defined in 39-71-116, by the health care provider.

*50-16-527 Patient authorization — retention — effective period — exception — communication without prior notice for workers' compensation purposes.*

.    .    .

(4) Notwithstanding subsections (2) and (3), a signed claim for workers' compensation or occupational disease benefits authorizes disclosure to the workers' compensation insurer, as defined in 39-71-116, or to the agent of a workers' compensation insurer by the health care provider. The disclosure authorized by this subsection authorizes the physician or other health care provider to disclose or release only information relevant to the claimant's condition. Health care information relevant to the claimant's condition may include past history of the complaints of or the treatment of a condition that is similar to that presented in the claim, conditions for which benefits are subsequently claimed, other conditions related to the same body part, or conditions that may affect recovery. A release of information related to workers' compensation must be consistent with the provisions of this subsection. Authorization under this section is effective only as long as the claimant is claiming benefits. This subsection may not be construed to restrict the scope of discovery or disclosure of health care information as allowed under the Montana Rules of Civil Procedure, by the workers' compensation court, or as otherwise provided by law.

Finally, § 39-71-604(2), MCA, contains a provision identical to § 50-16-527(4), MCA, set forth above.

¶16   Simms argues that the above statutes do not excuse Schabacker's conduct. He maintains that Schabacker's letter to Martello in response to his receipt of the videos was atypical of the parties' previous correspondence and is actionable because Martello's July 2, 2007 letter revealed to Schabacker that Martello was acting in his capacity as a "Special Assistant Attorney General." The text of Martello's letter—which was on State Fund stationery—makes no reference to the SAAG capacity or to any criminal

investigation; the quoted words simply appear under Martello's signature. Simms maintains that in light of this "disclosure" on the Martello letter, Schabacker knew he was assisting in a criminal investigation rather than simply providing information pertaining to Simms' medical condition, and that Schabacker should be held liable for providing medical opinions to a law enforcement agent in a criminal investigation that are adverse to his own patient.

¶17 In response, Schabacker points out that he had responded to multiple Montana State Fund communications over the years, all arriving on the same letterhead, regarding Simms' progress and treatment throughout the time that he acted as Simms' treating physician, and that this correspondence was exchanged as authorized by the statutes quoted above. These letters were copied to Simms, and Simms never objected to the communications. Schabacker submitted a sworn affidavit to the effect that when he drafted his response to Martello's initial letter containing the videos, he had no knowledge that Martello was associated with law enforcement in any manner. He stated he did not consider Martello's SAAG title to be a factor when responding to Martello's letter, and that he did not know that a criminal investigation of Simms was underway and never intended to assist in any such investigation.

¶18 In entering summary judgment, the District Court concluded that Schabacker and the State Fund were authorized to conduct ex parte communications with each other, and that the communications properly centered on healthcare information relevant to Simms' condition for which he was claiming benefits. The court found that the Notice of Privacy Policy executed by Simms, when read in conjunction with authorizing statutes

(§§ 50-16-805(1), 50-16-527, and 39-71-604, MCA), expressly permitted Schabacker to release relevant healthcare information regarding Simms to State Fund. While the court found it "troubling" that State Fund sent the videos to the doctor in the first place, it observed that the issue before the court was whether Schabacker's response to the videos breached the physician-client privilege and Simms' right to the privacy of his medical information. The court concluded that in light of the executed Notice of Privacy Policy and the statutes authorizing such communications, Schabacker did not breach the privilege, and further that the doctor had established that he had no knowledge that he was assisting a law enforcement agency when he wrote the letter to Martello. We find no error in these conclusions.

¶19 The sole basis for Simms' complaint against Schabacker is that because of the reference to Martello's SAAG status in one letter, Schabacker knew he was participating in a criminal investigation against his own patient when he informed Martello of his reaction to the videos. Schabacker flatly denied in an affidavit and sworn testimony that he knew Martello was acting in a law enforcement capacity, and the District Court relied upon these denials to conclude that the doctor had no knowledge he was assisting a law enforcement agency. However, we conclude that even if the SAAG status noted at the bottom of Martello's letter could arguably raise a question of fact about what the doctor knew, summary judgment was still appropriate in light of the provision in the Notice of Privacy Policy that NRPRC "may disclose any information we collect . . . [which] may include . . . disclosures related to . . . fraud investigations." *See* Opinion, ¶ 4. Thus, even if Schabacker suspected that a fraud investigation had commenced, his disclosure would

9

nonetheless be protected by virtue of the language of the Notice of Privacy Policy which was signed by Simms. Notably, Simms has not argued that he was coerced into signing the Notice or that he did not understand its contents.

¶20 The Dissent maintains that we err in omitting § 50-16-805(2), MCA, from our discussion. It posits that this statute, which addresses those situations in which healthcare providers may disclose healthcare information for law enforcement purposes, is in essence an absolute liability statute in that it does not require a healthcare provider to *know* that he is making a disclosure to law enforcement authorities in order for a violation of the statute to be established. We reject this argument for three reasons.

¶21 First, Simms has consistently argued that Schabacker *knowingly* made prohibited disclosures to Martello as SAAG in violation of the statute; thus, the position interposed by the Dissent is contrary to Simms' primary contention on appeal.

¶22 Second, we disagree with the proposition that the statute is an absolute liability statute. The Legislature is well aware of how to craft a statute so as to make clear that it intends the statute to impose absolute liability for the conduct described. For example, § 61-8-401(7), MCA, which addresses the offense of driving under the influence of alcohol or drugs, provides: "Absolute liability as provided in 45-2-104 [limiting the circumstances under which absolute liability may be imposed] will be imposed for a violation of this section." The intent to impose absolute liability is expressly stated. *State v. Parks*, 2013 MT 280, ¶ 40, 372 Mont. 88, 310 P.3d 1088 (Cotter, J., concurring). Here, there is no language in the statute to indicate that absolute liability is intended.

¶23  Finally, the Dissent ignores the fact that the Notice of Privacy Policy signed by Simms authorizes healthcare providers to make disclosures "related to fraud investigations." Nothing in § 50-16-805(2), MCA, limits or precludes actions taken in accordance with the provisions of such a document.

**CONCLUSION**

¶24  For the foregoing reasons, the decision of the District Court is affirmed.

/S/ PATRICIA COTTER

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ LAURIE McKINNON

Justice Michael E Wheat, dissenting.

¶25  I disagree with the Court's interpretation of the controlling statute. Therefore, I dissent. Because I believe a genuine issue of material fact existed, I conclude that the District Court erred by granting summary judgment, and would remand for trial on the merits.

¶26  As the District Court correctly noted, this Court has not yet applied or interpreted § 50-16-805, MCA, the statute that controls the matter at bar. Before we can decide whether the District Court correctly determined that there were no genuine issues of material fact, we must first review the District Court's decision as to what facts are material. This is a question of statutory interpretation, which we review de novo. *See Gordon v. Kuzara*, 2012 MT 206, ¶¶ 13, 18, 366 Mont. 243, 286 P.3d 895.

11

¶27 Without explanation, the Court implies that the proper inquiry for determining whether a violation of § 50-16-805, MCA, occurred is whether the health care provider —Schabacker in this case—*knowingly* assisted a law enforcement agency. This interpretation is not supported by the plain language of the statute.

¶28 Notably, the Court omits § 50-16-805(2), MCA, from its discussion. Instead, it limits its discussion to § 50-16-805(1), MCA. Yet, the meaning of § 50-16-805(1), MCA, is not clear without reference to § 50-16-805(2), MCA. Those sections read:

> (1) To the extent provided in 39-71-604 and 50-16-527, a signed claim for workers' compensation or occupational disease benefits authorizes disclosure to the workers' compensation insurer, as defined in 39-71-116, by the health care provider.
> (2) A health care provider may disclose health care information about an individual for law enforcement purposes if the disclosure is to:
> > (a) federal, state, or local law enforcement authorities to the extent required by law; or
> > (b) a law enforcement officer about the general physical condition of a patient being treated in a health care facility if the patient was injured by the possible criminal act of another.

¶29 It is a maxim of statutory interpretation that a general statute will yield to a specific statute. Section 1-2-102, MCA; *State v. Plouffe*, 2014 MT 183, ¶ 27, 375 Mont. 429, 329 P.3d 1255. Here, § 50-16-805(1), MCA, read with §§ 39-71-604 and 50-16-527, MCA, states a general rule: a health care provider may disclose relevant health care information to the workers' compensation insurer. Yet, where the disclosure is for more specific "law enforcement purposes" this rule yields to § 50-16-805(2), MCA. In such case, disclosure can only be made to law enforcement authorities or law enforcement officers, and only to the specific extent allowed.

¶30 Thus, the proper inquiry under this statute does not begin and end with whether the health care provider knew that he or she was disclosing information to a law enforcement authority; § 50-16-805(1), MCA, does not provide a safe-harbor for health care providers just because they subjectively believe their disclosures are being made to the workers' compensation insurer. Rather the inquiry is two-fold. First, a court must determine for what purpose the disclosure of health care information was made. While the health care provider's knowledge of the identity of the disclosure recipient may be a relevant factor here, it seems unlikely that it will be dispositive in every instance. For most purposes, the provider may properly disclose information to the workers' compensation insurer. If the disclosure was made for law enforcement purposes, however, the court must make a second inquiry. Namely, it must ensure that the disclosure was to "law enforcement authorities to the extent required by law," or to "a law enforcement officer about the general physical condition of a patient being treated in a health care facility if the patient was injured by the possible criminal act of another." Section 50-16-805(2), MCA.

¶31 While the first inquiry may turn on the subjective knowledge or purpose of the health care provider, the second does not. This Court has often stated that it will not insert what has been omitted or omit what has been inserted. Section 1-2-101, MCA; *Shockley v. Cascade Cnty.*, 2014 MT 281, ¶ 19, 376 Mont. 493, 336 P.3d 375. Here, the Court effectively omits the language regarding law enforcement purposes and inserts a knowledge requirement into the second part of the analysis. This is not justified by the

13

language of § 50-16-805, MCA. Nor was such a requirement intended by the Legislature. This becomes clear upon consideration of § 50-16-817, MCA.

¶32 That section provides civil remedies for violation of Title 50, part 16, MCA, and it is the section pursuant to which relief could be granted in the present case. Notably, § 50-16-817(4), MCA, provides that:

> If the court determines that there is a violation of this part, the aggrieved person is entitled to recover damages for pecuniary losses sustained as a result of the violation and, *in addition*, if the violation results from *willful or grossly negligent* conduct, the aggrieved person may recover not in excess of $5,000, exclusive of any pecuniary loss.

(emphasis added). This statute allows recovery of damages for any violation of Title 50, part 16, MCA, including § 50-16-805, MCA. It does not require any particular knowledge or state of mind. Instead, it allows for *enhanced* damages when certain states of mind are shown. *See* § 1-1-204(5), MCA (defining "willfully").

¶33 The specific inclusion of enhanced damages for "willful" conduct or "grossly negligent" conduct, further demonstrates that the Legislature specifically excluded the similar, state-of-mind modifier "knowingly" in both § 50-16-817, MCA, and the related § 50-16-805, MCA. *Compare* § 1-1-204(2), MCA (defining "knowingly"), *with* § 1-1-204(5), MCA (defining "willfully"). The Legislature intended to make no distinction between a knowing violation and an unknowing one.

¶34 Thus, the Court errs by making that distinction here. While the difference between the Court's analysis and the one discussed in this dissent may seem minor, the practical outcome is not. By requiring actual knowledge of disclosure to a law enforcement entity, the Court creates incentives for the health care provider to learn as

14

little as possible about the particular entity to whom he or she is providing information. This further complicates an already complex relationship between the patient, doctor, workers' compensation insurer, and law enforcement officials. The Court's interpretation pushes the health care provider, who is already caught between the other parties and must already carefully balance his or her relationships with the patient, insurer, and law enforcement, further away from the patient; it allows the health care provider to become an agent of law enforcement rather than an advocate for his patient, if he or she does so unknowingly. This is not what the Legislature intended.

¶35   Instead, the Legislature stated in § 50-16-801, MCA, that:

> [H]ealth care information is personal and sensitive information that if improperly used or released may do significant harm to a patient's interests in privacy and health care or other interests; [and]
>
> .   .   .
>
> it is in the best interest of the citizens of Montana to have certain requirements, with respect to the use or release of health care information by health care providers, that are more restrictive than or additional to the health care privacy protections of HIPAA.

The two-step analysis required by § 50-16-805, MCA, better protects these legislative goals than the Court's interpretation. It places the burden of safeguarding a patient's information and of determining whether its disclosures are legally permissible with the health care provider; depending on the purpose for the disclosure, the health care provider must ensure that it is disclosing information to a permissible party. As the Legislature intended, this bolsters the doctor-patient relationship and helps to ensure that privileged

health care information is protected. For this reason, the analysis discussed above is preferable to the analysis applied by the Court.

¶36 Yet, regardless of whether or where a subjective "knowingly" standard should be applied, I disagree with the Court's decision that there was no genuine issue of material fact. As the District Court did, this Court relies too heavily on Schabacker's affidavit and testimony, while giving too little weight to Simms' arguments and evidence. Simms presented arguments and evidence indicating the following:

- Schabacker was contacted by Thomas Martello, a Special Assistant Attorney General.

- Schabacker was given what he knew to be surveillance footage of Simms.

- Schabacker provided more than health care information to Martello; Schabacker suggested "misrepresentation" on the part of Simms and declared the surveillance tape to be "disturbing" in light of the Schabacker's testimony and advocacy on Simms' behalf.

Additionally, Schabacker stated in his affidavit that:

> Although my main purpose in writing the letter was to communicate with the Montana State Fund regarding Simms' condition, I also wanted to make clear that I had not previously known that Mr. Simms had the mobility portrayed in the videos and that I would need to reassess his condition and treatment. I also wanted to state that my prior assistance to Mr. Simms in obtaining benefits was done without any knowledge of his true mobility and that I may have inadvertently assisted him in obtaining benefits he was not entitled to.

¶37 A court considering summary judgment must view the evidence in a light most favorable to the non-moving party, and all reasonable inferences are to be drawn in favor of the party opposing summary judgment. *Thornton v. Flathead Cnty.*, 2009 MT 367, ¶ 13, 353 Mont. 252, 220 P.3d 395. Drawing such inferences, the foregoing evidence

may reasonably establish that Schabacker knew he was disclosing health care information to a special assistant attorney general; that Schabacker understood the surveillance nature of the videos he was supplied with; and that the character of Schabacker's communication was defensive of Schabacker's own role and accusatory toward Simms. Accordingly, a trier of fact might reasonably have found that Schabacker knew he was disclosing health care information to a law enforcement agency or for law enforcement purposes.

¶38 Yet, the District Court gave credence to Schabacker's self-serving assertion that he did not know that Martello was a special assistant attorney general or involved with a criminal investigation at the time Schabacker wrote his letter. Viewed in the light most favorable to Simms, this statement at most establishes that Schabacker did not know Martello's identity when he was writing the letter. Given that over a month passed between the times when the letter was written and when it was sent, this says nothing of Schabacker's knowledge at the time the health care information disclosure actually occurred. For these reasons, there was a genuine issue of material fact, and the District Court should not have granted summary judgment.

¶39 The Court contends that the foregoing is of little consequence given the disclosure permissions granted in the Notice of Privacy Policy. Yet, the Court ignores the limitations built into what it interprets as the document's unequivocal permission for the health care provider to disclose health care information to the workers' compensation insurer. *See* Opinion, ¶ 18. While the Notice of Privacy Policy does, as the Court states, allow NRPRC to "disclose any information [it] collect[s]," NRPRC is only allowed to do

so "when permitted or required by law." Given the foregoing discussion, whether the disclosure in this case was permitted by law turns on whether Schabacker made the disclosure for a law enforcement purpose or, under the Court's analysis, knowingly to a law enforcement agent. In either case, there is a genuine issue of material fact and the Notice of Privacy Policy does not make summary judgment proper.

¶40 I believe this Court's interpretation of § 50-16-805, MCA, was erroneous. For this reason, I cannot join the Court's Opinion. I dissent because under the proper § 50-16-805, MCA, analysis and the one applied by this Court, there was a genuine issue of material fact. I would reverse and remand to the District Court for this reason.


/S/ MICHAEL E WHEAT